UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


~~~~~~~~~~~~~~~~~~~~~~~~~~~~~:
In Regard to the Matter of: :
                            :   **Civil Action No. 97-5127**
BAYSIDE STATE PRISON        :
LITIGATION                  :       **OPINION/REPORT**
                            :           **OF THE**
SUPERVISORY LIABILITY       :       <u>**SPECIAL MASTER**</u>
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~:

        LOUGHRY & LINDSAY
        By:  Justin T. Loughry, Esquire
             Lawrence W. Lindsay, Esquire
        330 Market Street
        Camden, New Jersey  08102
        Attorneys for Plaintiffs

        Jaime Kaugh, Esquire
        Rodney D. Ray, Esquire
        32 North Black Horse Pike
        Blackwood, New Jersey  08012
        Attorneys for Plaintiffs

        ROSELLI, GRIEGEL, LOZIER & LAZZARO
        By:  Mark Roselli, Esquire
             Steven Griegel, Esquire
             Kenneth W. Lozier, Esquire
             James Lazzaro, Esquire
        1337 State Highway 33
        Hamilton Square, New Jersey  08690
        Attorneys for Defendants

        PAULA T. DOW
        Attorney General of New Jersey
        By:  Dianne Moratti
             Deputy Attorney General
        Hughes Justice Complex
        P.O. Box 112
        Trenton, New Jersey  08625
        Attorney for Defendants

BISSELL, Special Master

This Opinion/Report, addressing the subject of supervisory liability regarding the Bayside State Prison complaints tried before me as a Special Master, is being issued pursuant to the powers granted in ¶¶ 7 and 8 of the Order of Reference to a Special Master and ¶¶4, 5 and 14 of the Special Master Agreement which govern these proceedings. It is anticipated that this decision may be reviewed consistent with the terms of those documents. Because I write for the parties and counsel who are intimately familiar with the factual and procedural history of the Bayside proceedings, I will not undertake a detailed review of that history. Factual and procedural items material to issues addressed herein will be referred to at that time. Furthermore, although there is record evidence not specifically mentioned in this Opinion/Report which might either support or weigh against the decisions embodied herein, that evidence, although not referred to, has been fully reviewed and considered.

For reasons set forth below, I determine that William Fauver, Gary Hilton and Scott Faunce bear supervisory liability for the claims proven before me resulting from the lockdown at Bayside State Prison for the period July 30, 1997 through September 3, 1997. Lt. Donald Coughlan, however, was not such a supervisor. Although not

conclusive on this issue, it is relevant that in the Sixth
Amended Complaint, it is not asserted that Mr. Coughlan was
a supervisor.  Indeed, he was a field leader of the SOG
units dispatched to Bayside who basically implemented
policies established and promoted by others.  No
supervisory liability attaches to him.

The subject of supervisory liability has been
addressed frequently in the last decade, and more
particularly in significant Third Circuit decisions as well
as decisions of Judge Kugler and the Third Circuit in
several Bayside cases.  Supervisory liability for Section
1983 violations, including of course Eighth Amendment
claims alleging cruel and unusual punishment, is
essentially addressed in two ways.  The Third Circuit in
Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001),
has stated the general test regarding supervisory liability
as follows:

> An Eighth Amendment claim against a
> prison official must meet two
> requirements:  (1) "the deprivation
> alleged must be, objectively,
> sufficiently serious;" and (2) the
> "prison official must have a
> sufficiently culpable state of mine."
> Farmer v. Brennan, 511 U.S. 825, 834,
> 114 S.Ct. 1970, 128 L.Ed.2 811 (1994)
> (quotation marks and citations
> omitted).  In prison conditions cases,
> "that state of mind is one of
> 'deliberate indifference' to inmate

- 3 -

health or safety." Id. "Deliberate
indifference is a subjective standard
under Farmer - the prison official -
defendant must actually have known or
been aware of the excessive risk to
inmate safety. The parties agree that
the sexual assaults against Beers-
Capital and Tate were sufficiently
serious, so the determinative issue in
this case is whether the defendants'
actions and inaction rose to the level
of deliberate indifference. Depending
on the roles and responsibilities of
the respective defendants, the
plaintiffs have set forth two bases for
their claims of deliberate
indifference. With respect to the
defendants who are alleged to have had
notice that Whetzel was having sex with
one or more of the female residents at
YDC, the plaintiffs assert that these
defendants took inadequate (or no)
measures in response to this notice.
With respect to the defendants who are
not alleged to have had knowledge of
the specific risk that Whetzel posed,
the plaintiffs claim that these
defendants either implemented or failed
to implement YDC policies that created
a situation in which an employee like
Whetzel would be able to sexually
assault female residents at YDC without
being discovered for some time, and
that these defendants were aware that
such policies created this risk but
ignored it.

The cases that have resulted in an imposition of

supervisory liability after trials resulting from the

Bayside events of 1997 have focused on the first of the two

bases described in Beers-Capitol. See Mejias v. Roth, et

al. (3d Cir. Docket No. 07-3913, June 15, 2009) and Lindsey

- 4 -

v. Fauver, et al., (3d Cir. Docket No. 07-3739, July 22, 2009).

Judge Kugler took the opportunity to address the second basis outlined in Beers-Capitol in denying summary judgment to the defendants in an action brought by plaintiff David Lopez.  See In re: Bayside Prison Litigation, U.S.D.C. Docket No. 97-5127 (January 30, 2007), slip op. at 9-10.

It is understandable that the individual cases successfully tried to juries have focused on whether there was knowledge (either actual or properly imputed) of a particular risk to a particular plaintiff, thereby triggering supervisory liability.  As I have heard more than 100 cases during the past two years, however, there has necessarily been developed, by both plaintiffs and defendants, a much larger record regarding the circumstances at Bayside State Prison between July 30 and September 3, 1997.  I have come to the conclusion that the program so rapidly put in place on the morning of July 30, 1997, immediately after the murder of Officer Baker, was fatally and obviously flawed, and thus presented an obvious excessive risk to inmate safety.  Therefore, the second basis for supervisory liability: analyzing the lockdown and all of its features as a policy, with the obvious potential

- 5 -

for violations of the rights of inmates throughout Bayside
State Prison, is an approach that must be considered at
this time.

The first step in this undertaking is to revisit the
Beers-Capitol decision and the standards set forth therein.
Stating the basic principle applicable here, but relating
it to the allegations of the case before it, the Third
Circuit stated:

> From Farmer and Hamilton we extract the
> following precepts.  To be liable on a
> deliberate indifference claim, a
> defendant prison official must both
> "know of and disregard an excessive
> risk to inmate health or safety."
> Farmer, 511 U.S. at 837, 114 S.Ct.
> 1970.  The knowledge element of
> deliberate indifference is subjective,
> not objective knowledge, meaning that
> the official must actually be aware of
> the existence of the excessive risk; it
> is not sufficient that the official
> should have been aware.  See id. at
> 837-38, 114 S.Ct. 1970.  However,
> subjective knowledge on the part of the
> official can be proved by
> circumstantial evidence to the effect
> that the excessive risk was so obvious
> that the official must have known of
> the risk.  See id. at 842, 114 S.Ct.
> 1970.  Finally, a defendant can rebut a
> prima facie demonstration of deliberate
> indifference either by establishing
> that he did not have the requisite
> level of knowledge or awareness of the
> risk, or that, although he did know of
> the risk, he took reasonable steps to
> prevent the harm from occurring.  See
> id at 844, 114 S.Ct. 1970.

- 6 -

\*   \*   \*

     Second, the plaintiffs also claim
that the supervisor defendants, while
perhaps not aware of the particular
risk that Whetzel posed to these
specific plaintiffs, implemented
policies that were so defective that
they created an unreasonable and
excessive risk of abuse to the female
residents generally at YDC, and that
the defendants were aware of this risk.

Id. at 133.

Referring to a previous case, Sample v. Diecks, 885 F.2d

1099 (3d Cir. 1989), the Beers-Capitol court added:

     Sample involved a claim that a
supervisor was liable for a
subordinate's Eighth Amendment
violation because the supervisor
implemented deficient policies and was
deliberately indifferent to the risk
these policies generated.

Id. at 133-34.

    Elaborating further, the Third Circuit set forth its

specific four-part test for this second basis of

supervisory liability as follows:

     Presented with these facts, we
developed a four-part test, based on
the Supreme Court's reasoning in City
of Canton v. Harris, 489 U.S. 378, 109
S.Ct. 1197, 103 L.Ed.2d 412 (1989), for
supervisor liability on an Eighth
Amendment claim for failure to properly
supervise.  Under this regime, to hold
a supervisor liable because his
policies or practices led to an Eighth

- 7 -

Amendment violation, the plaintiff must
identify a specific policy or practice
that the supervisor failed to employ
and show that:  (1) the existing policy
or practice created an unreasonable
risk of the Eighth Amendment injury;
(2) the supervisor was aware that the
unreasonable risk was created; (3) the
supervisor was indifferent to that
risk; and (4) the injury resulted from
the policy or practice.  See Sample,
885 F.2d at 1118.

According to Sample, one way,
perhaps the easiest way, a plaintiff
can make out a supervisor liability
claim is by showing that "the
supervisory official failed to respond
appropriately in the face of an
awareness of a pattern of such
injuries."  Id.  But that it not the
only way to make out such a claim, as
"there are situations in which the risk
of constitutionally cognizable harm is
so great and so obvious that the risk
and the failure of supervisory
officials to respond will alone support
findings of the existence of an
unreasonable risk, of knowledge of that
unreasonable risk, and of indifference
to it."  (Citations omitted.)

Id. at 134.

As developed shortly hereafter, I am satisfied that

the plaintiffs have established that the lockdown at

Bayside, both as designed and thereafter implemented,

violated the Eighth Amendment rights of inmates under the

four-part test noted above.  The lockdown and all of its

features was indeed a "policy or practice [which] created

an unreasonable risk of . . . . Eighth Amendment injury."

- 8 -

Id.  Supervisors Faunce, Hilton and Fauver were aware that this "unreasonable risk was created."  Id.  These supervisors were "indifferent to that risk" both as inherently present in the lockdown plan and as abuses thereunder unfolded.  Id.  Finally, "injury resulted from the policy or practice," at least as to those plaintiffs who have established their claims before this Special Master.[1]  Id.

It is now appropriate to explore the lockdown program and its features which demonstrate supervisory liability in the cases tried before me.  The employment of a lockdown of all units at Bayside in the immediate wake of the murder of Officer Banker was not in itself improper.  It was an appropriate precaution at that point in order that the murder could be properly investigated to determine, inter alia, whether this was an isolated event perpetrated by a single inmate or whether it was symptomatic of a greater level of inmate hostility generating serious danger to other corrections officers and inmates alike.  Indeed, even

_____

[1]   As of March 1, 2010, the Special Master had issued in excess of 90 bench decisions in individual cases, of which approximately 20% resulted in verdicts and damages for particular plaintiffs.  Although the claims of many plaintiffs who did not prevail before me were exaggerated, impossible, and/or obvious fakes by persons seeking to piggyback on those claims which were legitimate, others, while plausible, were just not sustained by a preponderance of the evidence, each plaintiff's burden of proof.

the initial deployment of the SOG unit, consisting of approximately 50 members, for the purpose of evacuating Unit F, the search thereof and the escort of its inmates to Internal Affairs for interrogation and then to the gym to await the completion of the search, initiated on July 30 itself, would not rise to actionable conduct had SOG's presence been significantly reduced and soon eliminated once it became clear that Baker's murder by Inmate Beverly was both an isolated incident and not likely to generate further unrest at Bayside.  The elongation of the lockdown, accompanied by the continuous presence of SOG, however, a plan which I find was part of the original design imposed by Fauver and Hilton and endorsed and implemented by Faunce, quickly moved the situation over the line that defines supervisory responsibility for ensuing conduct. While I recognize the dangers of reflection in hindsight, as well as the necessity to scour all housing units and common areas for concealed weapons, no persuasive evidence in the record before me has established that the lockdown as designed and continued was necessary for that penalogical purpose.

Once the isolated nature of Beverly's attack on Baker was clear, a full lockdown with SOG's intimidating presence was not only unnecessary, but dangerous to the safety and

well-being of the inmates.  It must be remembered that, for the most part, the inmates at Bayside had either medium or minimum status with freedom of movement, unescorted, throughout the grounds, for their duties and activities. The dramatic change in status imposed by this lockdown when extended for more than 30 days (albeit with some refinements during the course thereof) had significant inherent risks in itself.

The presence of SOG, and particularly its autonomy and virtual immunity from meaningful scrutiny or discipline, exacerbated the risks exponentially.  SOG operated under its own rules, regimen, supervision and organization. Hilton and Fauver knew this from the outset, as did Faunce who, regarding any control of SOG, completely abdicated his responsibilities as the Administrator of Bayside.  SOG's MO and training was to come into a prison experiencing dangerous conditions, address and hopefully neutralize those conditions, restore all aspects of control of the prison to its administrators and corrections officers in a short time, usually a matter of one or two days, and leave. In a sense, SOG itself was a weapon to be deployed in aggravated, short-term situations such as riots, hostage taking or seizure of part of a prison by inmates.  This was not the situation at Bayside.  This SOG team was deployed

for more than one month, with members away from their
families and customary duty stations, staying overnight in
makeshift quarters, that is, completely outside their
standard operating procedure.

The SOG officers detailed for prisoner extractions,
prisoner movement, supervision of activities such as
showers and telephone calls, and other duties, were, by
design, completely unidentifiable.  Unlike regular
corrections officers, they wore no name plates or badges
allowing them to be identified.  These SOGs came from other
prisons and used face shields with the "riot gear" which
they wore when engaged in their activities.  Those aspects
of the lockdown program enhanced SOGs inability to be
identified.

As such, by the very nature of the SOG deployment,
there was an inherent and obvious potential for abuse of
the rights of inmates with no likely accountability for the
perpetrators.  One must remember in this respect that while
Bayside Prison housing officers, unarmed and vastly
outnumbered during their shifts in the inmate units, had
every incentive not to mistreat inmates during the
lockdown, for fear of later retaliation, the unidentified
and unidentifiable SOGs who eventually would leave the
premises had no such incentive.

- 12 -

As noted earlier regarding the dramatic change in routine which the lockdown imposed upon Bayside inmates, the "zero tolerance policy" which generated a marked increase in allegations of disciplinary infractions, a policy well-known to all in supervision, also enhanced the atmosphere of tension, unrest, uncertainty and thus danger to inmates.

Nothing has developed in this record since oral arguments before me on the supervisory liability issues on July 17, 2009 that would change my assessment of the deployment of SOG, stated on that occasion at pages 70 and 71, as follows:

> I'll be perfectly honest with you, no matter how this case ultimately comes out the lack of accountability of the SOG officers by either covered badges, no badges or this fairy tale about no meaningful rosters because the squad compositions were never strictly followed is, in my view, an absolutely and totally transparent effort to insulate them, the officers themselves, from any liability in this case. It's a disgrace. Now, I recall as a hint from some of the testimony here that some of that has been changed. I believe Mr. Hilton mentioned that they no longer send SOGs in without identification.
>
> MR. LOUGHRY: Judge, I can represent to you that there was extensive testimony at the injunction hearing that they had made some changes.

JUDGE BISSELL:  All right.  And that may be so.

And, frankly, to be honest with you, that goes into my thinking in terms of whether or not there was [sic] such inherent risks in the composition of that unit and its deployment here as to find its way into the Sample standards.

Defendants have directed my attention to the fact that the lockdown did not involve merely restrictions on movement throughout the prison and the deployment of SOG units, but also the salutary features of the deployment of ombudsmen and Internal Affairs officers to guard against the risk of prisoner abuse.  Orienting this decision to a statement in Beers-Capitol, defendants invoke a standard from that case which reads "finally, the official who was actually aware of the risk to the prisoner can avert liability by showing that he responded reasonably to the risk, even if the ultimate harm was not avoided."  Beers-Capitol, 256 F.3d at 132.

I have no quarrel with both the decision to have ombudsmen present throughout the lockdown and the manner in which they discharged their responsibilities.  Undoubtedly, many prisoner movements and unit searches observed by the ombudsmen were without incident, as they so reported.  Others reported their concerns both in writing and in oral

- 14 -

debriefings at the conclusion of their shifts; debriefings usually chaired by Faunce.  Faunce, however, chose to ignore any critical reports by ombudsmen and, on at least one occasion, passed off observations of cuts and injuries as attributable to an inmate's either falling out of bed or striking his head on a locker.  In short, the ombudsmen could not be everywhere, could not see everything, in many instances observed events without troublesome incidents and, when their concerns and adverse observations were reported, were virtually ignored.

Nor was the introduction of Internal Affairs investigators into this mix an adequate prophylactic against prisoner abuse.  This was inherent in the role assigned to IA which Hilton and Fauver knew and which Faunce surely must have known when IA's discharge of its role became obvious.  Internal Affairs was initially dispatched to debrief the occupants of Unit F regarding any evidence of the murder of Officer Baker.  Thereafter, on the scene, they occasionally filmed prisoner movements. However, this filming was far from complete and, in the obvious presence of a camera, one would not expect SOG officers on that occasion to assault inmates.  The record also reflects a marked shortage of cameras during the lockdown.  The IA cameramen rarely if ever went into cells

- 15 -

during extractions.  Furthermore, one cannot help but notice upon reviewing several of IA's films introduced into evidence how talented SOG officers are at getting between the camera and an inmate.  Invariably, the camera man is relegated to a position at the end of the line of SOG officers who are very large men operating in a confined space with the prisoner in front of them.  While there is no specific evidence of abuse of a prisoner in such a situation, the futility of IA filming is amply demonstrated by this pattern.

Of course, if the filming was designed to demonstrate either the presence or the absence of inmate abuse to supervisors, for their information and action if necessary, that too was consciously avoided by Hilton.  He testified that he did not look at films, but rather forwarded them to the office of the Attorney General.  Mr. Hilton's lame excuse for this course of conduct was that if investigations of one or more abuses were to ensue, he did not want to be accused of potentially compromising the investigation by an early look at the films.  Once again, under Beers, it cannot be argued that the supervisors charged here responded reasonably to the risk of inmate harm by implementing and executing such a futile, ineffective filming program.

- 16 -

It is further urged that the presence of IA officers could serve as a deterrent to prisoner abuse because they would be called upon to respond to and investigate prisoner complaints. However, as demonstrated time and again in this record, any such investigations (undertaken in response to complaints of those few prisoners who were not so intimidated as to refuse to do so) took weeks and months to complete. Furthermore, invariably these investigations led to "unproven" charges in large measure because of the inability to identify perpetrators in the SOG units.

Thus we see that it cannot be persuasively argued that the presence of ombudsmen and Internal Affairs officers, including the filming program, constituted anything like a reasonable feature of the lockdown program calculated to promote inmate safety.

There are other aspects of the lockdown plan, as implemented, which further demonstrate its adverse impact on the Eighth Amendment rights of Bayside inmates. It was certainly to be expected by all supervisors involved that SOG officers, particularly because of their virtual immunity from identification and prosecution, would further solidify that immunity by threatening any inmates against whom they had perpetrated assaults with additional beatings should these inmates make any complaints to either medical

- 17 -

or administrative personnel.  If this were not enough, although duty rosters were created to designate each member of an SOG squad, which might have allowed the identification of such a squad in response to an inmate's complaint, it was clear from the outset that those duty rosters were inaccurate.  SOG members were shifted from squad to squad as deployed, thereby rendering the duty rosters useless.  As such, these threats, eminently foreseeable by those who deployed the SOGs to Bayside, further imperiled the health of inmates by dissuading them from seeking necessary medical attention, thwarted the ability of persons like Ellis or Bayside corrections officers to remedy the problems and effectively rendered any administrative remedy process "unavailable"  at Bayside to injured inmates.

Finally, and perhaps most curious, Mr. Hilton testified before me that the lockdown was continued in place for more than a month in order that construction work could be performed mostly in the mess hall area.  Hilton stated that such restrictions would have to be put in place anyway when that construction was undertaken and that it was predominantly designed to enhance the safety of all concerned during the inmates' use of the central mess hall. Fauver was aware of this construction work and discussed it

- 18 -

at his deposition. Tr. Dep. 2/14/00 at 57-58. Faunce necessarily knew that this work was also taking place. Why a total lockdown, as opposed to merely in-unit feeding while the mess hall was closed, would be necessary for this construction work completely defies credulity. Secondly, knowing as they must have, based upon considerable experience in the prison system, that tensions and danger to all involved can only increase as a lockdown is extended, particularly in a medium/minimum facility, where SOG had been introduced into the mix, how could Fauver, Hilton and Faunce begin to justify this extension of the lockdown in order merely to complete a construction project? If this is an excuse offered after the fact, it provides no justification for the extended lockdown. If it was part of the lockdown plan either as designed or implemented, then it is a further feature of that plan which exacerbated the threats to inmate safety previously discussed.

In summary, all elements of basis number two in the Beers-Capitol analysis for the imposition of supervisory liability due to the design and implementation of the Bayside lockdown have been established. That liability has been established as to Commissioner Fauver who, although not often on the scene at Bayside, worked with Hilton in

designing the plan and deciding to put it in place. He knew and/or must have known of the inherent dangers and risks to inmate safety, yet endorsed the initiation and continuation of this plan, far beyond its necessity to deal with circumstances in the wake of the murder of officer Baker. Hilton is similarly liable on the same basis, plus his on-the-scene knowledge of the plan as implemented including its operational threats and deficiencies, particularly regarding the virtually unchecked autonomy and immunity of SOG. Faunce, although not the designer of the lockdown plan, became aware of its aspects and dimensions immediately. He accepted the autonomy of SOG thereby abdicating in this critical respect the responsibility and control with which he was charged as the prison Administrator. Faunce also ignored the warning signs regarding prisoner abuse which, had they been heeded, could have generated a reasonable response by him to the obvious risks; however, he did virtually nothing in that regard.

While I have determined that there is supervisory liability here on behalf of Faunce, Hilton and Fauver for compensatory damages for successful plaintiffs in the cases brought before this Special Master, I also determine that the conduct of these defendants (or any of them) does not rise to the level of warranting the imposition of punitive

- 20 -

damages.   The Third Circuit, in the <u>Mejias</u> and <u>Lindsey</u>

cases addressed the issue of supervisory liability for

punitive damages.   Illustrative here is the Third Circuit's

language in <u>Lindsey</u>.

> Judge Kugler properly instructed the
> jury, advising them that punitive
> damages could be imposed if "defendants
> engaged in reckless or callous
> indifference . . . to the plaintiff's
> federally protected right(s)," and if
> compensatory damages were insufficient
> to deter misconduct in the future.
> D.A. 814a.  As discussed, Lindsey
> introduced evidence sufficient for a
> reasonable jury to conclude that
> Faunce, Hilton and Fauver, who were
> aware, but chose to disregard, reports
> of inmate abuse, acted with deliberate
> indifference to plaintiff's
> constitutional rights.  <u>See</u> <u>Farmer</u>, 511
> U.S. at 836 (acting or failing to act
> with deliberate indifference to a
> substantial risk of serious harm to a
> prisoner is the equivalent of
> recklessly disregarding that risk).
> Other facts also supported a punitive
> damages verdict here:  That Lindsey
> suffered physical rather than solely
> economic harm; that Fauver, Hilton and
> Faunce occupied unique positions of
> authority and responsibility; and that
> punitive damages were potentially
> necessary to deter administrative
> complacency and ensure inmate safety.
> Accordingly, the imposition of punitive
> damages was not improper.

<u>Id</u>., slip op. at 11-12.

Recognizing that the liability standard of "deliberate

indifference to a substantial risk of serious harm to a

2310039-01

prisoner" can be "the equivalent of recklessly disregarding
that risk", it does not necessarily follow that, in every
case of proven supervisory liability due to such
"deliberate indifference" as the defendants exercised here,
punitive damages must also be awarded.  Surely some measure
of discretion resides in the finder of fact in making a
determination as to whether to impose punitive damages in
addition to those which are compensatory.  I do not
perceive that either <u>Farmer</u> or <u>Lindsey</u> would require the
imposition of punitive damages in every proven case of
"deliberate indifference to a substantial risk of serious
harm."

        In the case of Bar, I do not find that Fauver, Hilton,
Faunce or any of them acted with any measure of malice or
venality in the imposition of the lockdown program.  They
are civilly liable for compensatory damages to plaintiffs
who have proven injury as a result of the imposition of
that program.  However, while they acted with deliberate
indifference, I do not find that their conduct should be
characterized as a reckless disregard of the risks involved
or as in any way malicious or venal.  Regarding the factors
enumerated by the Third Circuit in the <u>Lindsey</u> opinion,
while indeed the successful plaintiffs here suffered
physical injury, as did Mr. Lindsey, I note also that

Messrs. Fauver, Hilton and Faunce are all retired from
their supervisory positions. I would also expect that their
successors have learned much from the magnitude, duration
and expense of the Bayside litigation over approximately 13
years.  Relatedly, I do not find that the imposition of
punitive damages on Messrs. Fauver, Hilton and/or Faunce is
necessary to deter either their administrative complacency
or that of their successors.  Furthermore, improvement of
inmate safety can, should and, in all likelihood, has come
from increased enlightenment and other sources over the
years.

Accordingly, Messrs. Fauver, Hilton and Faunce shall
be jointly and severally liable for the compensatory damage
verdicts arising from these Special Master proceedings as
to the successful plaintiffs/inmates.  The punitive damages
awards, however, embodied in some of those verdicts may not
be laid at the feet of these supervisory defendants.  Of
course, the punitive damages awards stand where imposed on
the actual perpetrators of the injuries, although the
Special Master recognizes the plaintiffs' difficulties in
pursuing the collection of those sums.  Moreover, no
further exploration, whether delving into the supervisory
defendants' financial circumstances or otherwise, should be
undertaken for the purpose of imposing something in the

nature of a general punitive damages verdict attributable to the conduct of these defendants.

Accordingly, based on the determinations set forth above, I recommend to the U.S. District Court that, in each case where this Special Master has found liability and damages based upon violations of the Eighth Amendment Rights of an inmate at Bayside State Prison, during the period July 30 through September 3, 1997,[2] judgment also be entered in favor of that plaintiff, for the proven compensatory damages only, against William Fauver, Gary Hilton and Scott Faunce, jointly and severally.

DATED:

*March 29, 2010*

_____
JOHN W. BISSELL
Special Master

---

[2]    I recall that some cases have been tried before me where assaults on plaintiffs allegedly occurred after the period of the lockdown at Bayside and after the SOG unit had departed.  Because the basis for supervisory liability here is the lockdown policy and program itself (as designed and implemented) I find there is no basis for supervisory liability for claims based on alleged Eighth Amendment violations occurring after September 3, 1997.

- 24 -